66 F.3d 664
 34 Collier Bankr.Cas.2d 332, Bankr. L. Rep. P 76,644
In re Carroll Dwight STANLEY, Debtor.
FIRST NATIONAL BANK OF MARYLAND, Plaintiff-Appellee,
v.
Carroll Dwight STANLEY, Defendant-Appellant,
and
Merrill Cohen; United States Trustee, Parties in Interest.
 No. 95-1004.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 13, 1995.
Decided Sept. 18, 1995.
 
 ARGUED: Richmond Timothy Paul Davis, Silver Spring, MD, for Appellant. Jay Voss Strong, Jr., Towson, MD, for Appellee.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 Affirmed by published opinion. Judge HALL wrote the opinion, in which Judge RUSSELL and Judge WIDENER joined.
 OPINION
 K.K. HALL, Circuit Judge:
 
 
 1
 Carroll Stanley, the debtor in this Chapter 7 bankruptcy proceeding, and the United States Trustee appeal an order of the district court reversing, as clearly erroneous, the bankruptcy court's determination that Stanley is entitled to be discharged from a debt owed to First National Bank of MarylandB. Because the debt emanated from Stanley's infliction of a willful and malicious injury on FNB, we agree with the district court that discharge is inappropriate, and we affirm.
 
 I.
 
 2
 In October 1988, Stanley applied for a $10,000 line of credit with FNB. The application was approved, but only for $8,000, and was secured by a second mortgage on Stanley's residence in Silver Spring, Maryland. Unknown to the bank, Stanley had, a few months earlier, agreed to purchase a new home elsewhere in Silver Spring.
 
 
 3
 Stanley drew down virtually the entire credit line a few days after it was approved. FNB mailed statements to Stanley at the end of October, November, and December 1988, that accurately reflected his balance and available credit. However, when Stanley received his January 1989 statement, it indicated--without explanation--that his credit line had been increased from $8,000 to $80,000.[1]
 
 
 4
 In May 1989, Stanley bought three acres of unimproved property in western Howard County, Maryland, for $199,000; he used the "extra" $72,000 in his credit line to fund the down payment and transaction costs. Because suburban sprawl had begun to reach Howard County, Stanley surmised that his real estate investment would appreciate five or ten thousand dollars in a year; he testified that he hoped to resell the property, repay both the note holder and FNB, and still make a profit. Stanley realized that his expenses--including the payments on the Howard County property, the two Silver Spring residences,[2] and the credit line with FNB--exceeded his income, but he planned to fund the deficit by using other sources of credit to obtain cash advances.
 
 
 5
 Unfortunately for Stanley--and apparently unknown to him at the time of his purchase--Howard County had recently stopped issuing building permits. Property owners who applied for permits were instead issued "allocation certificates," which merely ensured the owner's place in line if and when the moratorium was lifted. Because prospective buyers wanted to build immediately, the market for properties without accompanying permits plummeted. In June 1990, Stanley sold his Howard County property at a substantial loss.
 
 
 6
 Stanley's house of cards rapidly collapsed. FNB declared him to be in default of the loan agreement; in February 1992, it obtained a judgment of approximately $82,000 against Stanley on the debt, covering principal, interest, and attorney fees. Stanley filed for bankruptcy under Chapter 13 on April 1, 1992, but, about four months later, voluntarily converted the petition to Chapter 7.
 
 
 7
 In mid-February 1993, FNB filed a complaint in the bankruptcy proceeding, asking the court to except from discharge the bank's judgment debt against Stanley. The complaint alleged that discharge was barred by Section 523(a) of the Bankruptcy Code because (1) Stanley had incurred the debt through the use of false pretenses (Sec. 523(a)(2)(A)), and/or (2) Stanley's actions had inflicted a willful and malicious injury upon FNB (Sec. 523(a)(6)).[3]
 
 
 8
 The bankruptcy court conducted a hearing on January 31, 1994. See note 1, supra. It found, by a preponderance of the evidence,[4] that neither Paragraph 2 (false pretenses, etc.) nor Paragraph 6 ("willful and malicious" injury) of Section 523(a) applied to prevent Stanley's debt to FNB from being discharged. The bank appealed to the district court, which, on November 18, 1994, heard oral argument on the matter; it subsequently entered an order reversing the judgment of the bankruptcy court and declaring the debt to be non-dischargeable under both paragraphs. Stanley and the Trustee appeal.
 
 II.
 A.
 
 9
 Because the district court sits as an appellate court in bankruptcy, our review of the district court's decision is plenary. Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir.1988). In essence, we stand in the shoes of the district court, inasmuch as we may not, generally speaking, set aside a finding of fact made by the bankruptcy court unless it is clearly erroneous. Bankruptcy Rule 8013; In re Johnson, 960 F.2d 396, 399 (4th Cir.1992). However, the "clearly erroneous" standard does not insulate findings "made on the basis of the application of incorrect legal standards." Consolidation Coal Co. v. Local 1643, UMWA, 48 F.3d 125, 128 (4th Cir.1995) (quoting Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1526 (4th Cir.1984)). Our review of the bankruptcy court's application of the law is de novo. Johnson at 399.
 
 B.
 
 10
 We have previously had occasion to consider what constitutes a willful and malicious injury under Section 523(a)(6). See St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 F.2d 1003, 1009 (4th Cir.1985). In St. Paul, Vaughn, a painting contractor, became embroiled in a dispute with the Navy over a job at the Norfolk shipyard, and was constrained to call on his surety to make over $500,000 in payments to his subcontractors and suppliers under a performance bond. The dispute was eventually settled, and the parties arranged for the Navy to make payments directly to Vaughn, who, in turn, was to turn over portions of those payments to the surety to reimburse it for the "front money" that it had provided.
 
 
 11
 Vaughn received a check for $479,000, and, instead of abiding by the terms of the arrangement, he spent the surety's $250,000 share on real estate, antiques, and a luxury automobile. He then filed for bankruptcy. Under the circumstances--and despite a jury verdict to the contrary--we had no difficulty affirming the district court's judgment that Vaughn had acted willfully and maliciously, and therefore was not entitled to be discharged from his debt to the surety.
 
 
 12
 We noted in St. Paul that "willful" means "deliberate or intentional." Id. (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 365 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6320-21). Thus, we ascribe to the word "willful," as it pertains to Section 523(a) of the Bankruptcy Code, a meaning similar to that derived from its use in other areas of the law.
 
 
 13
 "Malice," however, does not mean the same thing in Section 523(a) that it often does in other contexts. A debtor may act with malice even though he bears no subjective ill will toward, and does not specifically intend to injure, his creditor. See id. at 1008-09. Hence, a debtor's injurious act done "deliberately and intentionally in knowing disregard of the rights of another," i.e., a creditor, is sufficiently willful and malicious, and prevents discharge of the debt. Id. at 1010 (citation omitted).
 
 
 14
 Because the St. Paul test requires a deliberate act in "knowing" disregard of a creditor's rights, it is the debtor's subjective state of mind that is relevant; it does not matter that a "reasonable debtor" should have known that his act would adversely affect another's rights. However, a particular debtor's knowledge may be proved by circumstantial evidence: "Implied malice ... may be shown by the acts and conduct of the debtor in the context of [the] surrounding circumstances." Id.; In re McNallen, 62 F.3d 619, 625 (4th Cir. 1995).
 
 
 15
 The act or conduct at issue here, as in St. Paul, is a conversion--an unauthorized exercise of dominion or control over property belonging to another that seriously interferes with the owner's rights. See United States v. Stockton, 788 F.2d 210, 216 (4th Cir.), cert. denied, 479 U.S. 840, 107 S.Ct. 147, 93 L.Ed.2d 89 (1986). Although a person need not know that someone else has superior ownership rights in the property to be technically liable for the tort of conversion, see id. & n. 7, St. Paul 's test for malice requires such knowledge on the debtor's part before discharge will be denied--in other words, the debtor must have engaged in a "wrongful" conversion.
 
 
 16
 In this case, the conversion was wrongful. As evidenced by his telephoning the Glenmont branch, Stanley knew that something was amiss when his credit limit was suddenly increased by a factor of ten. Stanley's explanation that he thought that the bank had granted him a $72,000 "unsecured" line of credit is wholly irreconcilable with his knowledge that, just three months earlier, he had been approved for $2,000 less than the relatively modest secured line that he had requested. We note also that Stanley, though not a loan officer, is an accountant with one year of graduate school education; he is by no means unsophisticated.
 
 
 17
 In finding that he lacked the requisite malice to be denied discharge, the bankruptcy court concentrated on Stanley's intent to repay FNB out of the "profits" from the sale of the Howard County property. The bankruptcy court's finding that Stanley acted with hopeful intentions is probably correct; indeed, Stanley remained current on his FNB payments for over a year. However, that Stanley did not intend for FNB to ultimately suffer a loss is legally irrelevant. For conversion to occur, it is not necessary that the property be damaged, but merely that the owner suffer a serious deprivation of the incidents of ownership.
 
 
 18
 Consequently, the proper focus in this case is not on Stanley's "good intentions," but simply on his exercise of dominion and control over funds that he knew belonged to another. Stanley's deliberate conversion of the funds is the intentional, wrongful act that prevents the discharge of his debt to FNB.
 
 
 19
 Because the bankruptcy court's finding that Stanley's debt was dischargeable was premised on the application of an incorrect legal standard, the deferential standard of review ordinarily accorded such findings does not apply. See Section II-A, supra. Applying the correct legal standard to the facts of this case, we reach the only reasonable conclusion: Stanley inflicted a willful and malicious injury on FNB; thus, he is not entitled to be discharged from the resultant debt.[5]
 
 III.
 
 20
 The judgment of the district court is affirmed.
 
 
 21
 AFFIRMED.
 
 
 
 [1]
 Stanley testified that he called FNB's Glenmont branch, where he had applied for the credit line, and asked the branch manager, Glynis Noyes, whether the statement was accurate. Noyes, whose computer could only access current account information, verified that the limit was indeed $80,000. Although Noyes had since left FNB and was unavailable to testify, the evidence was that she could only have determined whether a data entry mistake had occurred by checking the loan paperwork, which apparently was not on file at the branch. Likewise, Noyes's computer would not have alerted her that Stanley's credit limit had recently increased tenfold
 Stanley could not recall Noyes by name at deposition, but, as a result of reviewing bank documents with her name on them in preparation for trial, testified at the hearing that she was the person to whom he had spoken. One Glenmont employee testified--albeit with less than unshakable certitude--that, to the contrary, Noyes had left the branch prior to January 31, 1989. None of the Glenmont employees who testified remembered receiving a call from Stanley.
 The bankruptcy court found the following regarding the phone call:
 We're talking about events now six years almost in the past, five at least, and everyone I think probably forthrightly attempted to recall what best they [thought] had occurred. The Court did find credible the testimony of the debtor concerning this phone call and finds as a fact that the call came in and that the call was an inquiry concerning what was the credit limit at that time.... The Court ... does not find that the absence of a more pointed inquiry at that point somehow constitutes a showing of intent by the debtor to deceitfully take that which the debtor was not entitled to in the debtor's mind.
 
 
 [2]
 According to the terms of the junior lien, Stanley could not sell his old residence without FNB's consent. He instead leased it for slightly less than his monthly mortgage payment
 
 
 [3]
 Section 523 provides:
 (a) A discharge under section 727 ... of this title ... does not discharge an individual debtor from any debt
 * * *
 (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by--
 (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
 * * *
 (6) for willful and malicious injury by the debtor to another entity or to the property of another entity....
 11 U.S.C.A. Sec. 523(a)(2)(A), (a)(6) (West 1993).
 
 
 [4]
 Under Section 523(a), a debtor's misconduct--even where fraud is involved--need only be shown by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)
 
 
 [5]
 Because we hold that discharge is barred by Section 523(a)(6), we do not reach the district court's alternative holding that Stanley obtained the funds by false pretenses, barring discharge under Section 523(a)(2)(A)