United States Court of Appeals

FOR THE EIGHTH CIRCUIT

---

No. 95-3913

---

In re: Paul W. Geiger,                        *
                                              *
     Debtor.                                *
                                              *
-------------------------                     *
                                              *                    Paul
W. Geiger,          *
                                              *
     Appellant,                             *
                                              *  Appeal from the United States
       v.          *          District Court for the Eastern
                                              *  District of Missouri.
Margaret Kawaauhau and                        *
Solomon Kawaauhau,                            *
                                              *
     Appellees.                             *

---

Submitted:  January 14, 1997

Filed:  May 14, 1997

---

Before RICHARD S. ARNOLD, Chief Judge, and McMILLIAN, FAGG, BOWMAN,
    WOLLMAN, MAGILL, BEAM, LOKEN, HANSEN, MORRIS SHEPPARD ARNOLD, and
    MURPHY, Circuit Judges.

---

MORRIS SHEPPARD ARNOLD, Circuit Judge.

     This case raises the question whether a judgment debt resulting from
a medical malpractice action is dischargeable in bankruptcy.  The
Kawaauhaus maintain that it is not, because it is a "debt ... for willful
and malicious injury by the debtor," which 11 U.S.C. § 523(a)(6) exempts
from discharge.  The bankruptcy court

agreed with the Kawaauhaus, see In re Geiger, 172 B.R. 916 (Bankr. E.D. Mo. 1994), and the district court affirmed that judgment in an unpublished opinion. On further appeal, a unanimous panel of this court reversed, relying on Cassidy v. Minihan, 794 F.2d 340 (8th Cir. 1986). The panel observed that the worst that might even colorably be said of the debtor's behavior was that it was reckless, and that since there was no evidence that he intended to harm his patient, it was not possible to say that his actions were either willful or malicious, much less both. See In re Geiger, 93 F.3d 443 (8th Cir. 1996).

We granted the Kawaauhaus' subsequent suggestion for rehearing en banc, and we reverse the judgment of the district court.

I.

Mrs. Margaret Kawaauhau sought treatment from Dr. Paul Geiger after she injured her foot. He admitted her to the hospital for treatment for thrombophlebitis, ran tests that suggested the presence of an infection, and concluded that continuing the oral tetracycline that he had already prescribed would be an effective treatment for her condition. He eventually prescribed oral penicillin in place of the tetracycline. Dr. Geiger then departed on a business trip, leaving his patient in the care of other physicians, who began to administer intramuscular penicillin and decided to transfer her to an infectious disease specialist. When Dr. Geiger returned from his trip, however, he discontinued all antibiotics because he believed that the infection had run its course. A few days later, Mrs. Kawaauhau's condition deteriorated and her leg had to be amputated below the knee. When the Kawaauhaus succeeded in an action for malpractice against Dr. Geiger, he petitioned for bankruptcy.

In an effort to prove that the malpractice judgment was not a dischargeable debt, the Kawaauhaus introduced into evidence before the bankruptcy court certain portions of the transcript of the trial of the malpractice action. The transcript revealed that Dr. Geiger had admitted at trial that the proper treatment for the streptococcus infection with which he was faced was intravenous penicillin, that he knew that at the time, but that he had nevertheless administered the penicillin orally partly because his patient had frequently complained about medical expenses (he had been treating her for a number of years) and had specifically expressed a desire to avoid costly medicines. In response to a direct question about whether he acknowledged that intravenous penicillin was "the proper standard of care in the circumstances," Dr. Geiger answered that he did.

The Kawaauhaus, without objection from Dr. Geiger, also introduced into evidence before the bankruptcy court the deposition of Dr. Peter Halford, a physician hired to examine both Mrs. Kawaauhau's medical records and Dr. Geiger's testimony in the original trial and to render expert opinions based on them. In his deposition, Dr. Halford first offered his opinion that Dr. Geiger's treatment of Mrs. Kawaauhau had been negligent in at least four particulars: He had initially misdiagnosed her condition as phlebitis, or inflammation of the veins in her leg, rather than as an infection; he had initially given her the wrong antibiotic (tetracycline instead of penicillin); he had started penicillin too late, and then had administered it by mouth rather than intravenously; and he had stopped administering all antibiotics for a time. But Dr. Halford agreed with counsel that Dr. Geiger's most egregious error was that he had considered the relative costs of administering oral and intravenous penicillin in deciding which treatment to choose. It is mainly on the foundation of this last exchange that the Kawaauhaus have erected their theory that

Dr. Geiger acted willfully and maliciously, because, the argument runs, he intentionally rendered substandard care to Mrs. Kawaauhau, an act, the Kawaauhaus say, that necessarily led to her injury. "It is this intentional substandard treatment of the plaintiff," the Kawaauhaus said before the bankruptcy court, "in conjunction with the other misfeasance, that is the crux of our case."

Whether, in forming his opinion concerning the propriety of Dr. Geiger's treatment, Dr. Halford believed that Mrs. Kawaauhau had requested that Dr. Geiger cut costs, Dr. Halford did not say, and the bankruptcy court made no finding on the matter. Dr. Halford observed only that "cost certainly plays a role in what we choose if we have an alternative that is more economically feasible, but cost should have no role in directing our therapeutic efforts when you are dealing with life and death." Dr. Halford then reviewed the portion of Dr. Geiger's trial testimony in which he admitted knowing, "in fact, that intravenous penicillin was the appropriate standard of care for this type of problem and yet he intentionally used something that was less effective for the sake of cost." Dr. Halford ended his deposition by agreeing with the Kawaauhaus' lawyer that "Dr. Geiger intentionally administered substandard care to Margaret Kawaauhau that necessarily resulted in advancing infection in her leg, then loss of her leg, and permanent damage to her kidneys."

The bankruptcy court, though it did not say so directly, evidently credited everything that Dr. Halford said in his deposition, and concluded that "Dr. Geiger's treatment of Mrs. Kawaauhau was so far below the standard level of care that it can be categorized as willful and malicious conduct for dischargeability purposes." In re Geiger, 172 B.R. 916, 923 (Bankr. E.D. Mo. 1994). The bankruptcy court further opined that

in the context Dr. Geiger's consideration of costs "offends even a person lacking formal medical training." Id. In affirming the judgment of the bankruptcy court, the district court, relying on our opinion in In re Long, 774 F.2d 875 (8th Cir. 1985), indicated its belief that Dr. Geiger's admission that "he knew he was providing Mrs. Kawaauhau with substandard care when he prescribed oral penicillin" rendered his conduct willful, and the fact that "his conduct was certain or substantially certain to cause physical harm" rendered it malicious within the meaning of the relevant provision of the bankruptcy code.

## II.

We begin our consideration of this evidence by admitting to some uneasiness about the procedure employed in the bankruptcy court. The complaint before the bankruptcy court sought to have a judgment debt declared nondischargeable because, in the words of the statute, it was a "debt ... for willful and malicious injury." See 11 U.S.C. § 523(a)(6). The relevant judgment was entered, and thus the debt was necessarily predicated on, a jury verdict that was in turn based on evidence presented at a trial. The parties did not furnish us with a copy of the trial transcript, and we are thus unable to know what testimony the jury heard that might have convinced it that Dr. Geiger had committed medical malpractice. We therefore find it hard to understand how we can decide what conduct the verdict, and thus the "debt," was "for" within the meaning of the statute. We wonder about the propriety of going behind the pleadings in the original malpractice action, which asked for damages for Dr. Geiger's negligence, to decide what this "debt" was "for." (Plaintiffs prayed for punitive damages, but the issue was not submitted to the jury.) Even if the trial transcript contained particularly shocking evidence of gross negligence and recklessness, or even of intent to injure, we would have no way of

-5-

knowing what testimony the jury credited, what their verdict was supported by, and therefore what the "debt" under consideration was "for."

Dr. Geiger, however, does not raise these difficulties on appeal, and we leave them to another day, because we are of the view that the evidence before the bankruptcy court, even when viewed in a light most favorable to the Kawaauhaus, cannot make this debt one that is "for willful and malicious injury by the debtor," as the statute requires. See 11 U.S.C. § 523(a)(6).

This phrase has a long history. It was part of the Bankruptcy Act as early as 1898, and in Tinker v. Colwell, 193 U.S. 473, 481, 490 (1904), Mr. Justice Peckham gave it an expansive reading, leading to a holding that a judgment based on a husband's complaint for criminal conversation (adultery) was not dischargeable. Despite the debtor's argument that in order to be malicious his action had to have evidenced ill will toward the husband, the Court held that it was unnecessary under the statute for the debtor to have acted with "personal malevolence toward the husband." Id. at 485. It was enough (that is, the statute was satisfied) if the debtor had committed "'a wrongful act, done intentionally, without just cause or excuse.'" Id. at 486, quoting Bromage v. Prosser, 4 Barn. & Cres. 247, 255, 107 Eng. Rep. 1051, 1054 (K.B. 1825). In order for an act to be willful, it was, according to the Court, necessary only that it be intentional and voluntary. Tinker, 193 U.S. at 486. The obstacle erected by the statutory exception to discharge was therefore not nearly so formidable for a judgment creditor as a first reading of it might have made it appear. All that the creditor had to show was that the debtor had intentionally committed a wrongful act that was unjustified and unexcused. (How a wrongful act could ever be anything but unjustified, the Court did not explain.)

When the bankruptcy code was revised in 1978, the words of the exception to discharge under consideration in this case remained unchanged, but both the United States Senate and the United States House of Representatives, in reenacting what is now 11 U.S.C. § 523(a)(6), observed in legislative reports that they intended the word "willful" to mean "deliberate or intentional," and stated specifically that to "the extent that Tinker v. Colwell ... held" that a "less strict" (Senate), or "looser" (House), "standard is intended ... [it is] overruled."  See S. Rep. No. 95-989 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, and H.R. Rep. No. 95-595 (1977), reprinted in 1978 U.S.C.C.A.N. 5963.  Both houses of Congress also specifically stated that it was their intention to overturn any cases that had applied "a 'reckless disregard' standard" in deciding what debts were not dischargeable.  Id.  Not all of the cases that we have decided after the revision have focused very precisely on the exact meaning of this new appreciation of what debts the bankruptcy code protects from discharge.  See, e.g., In re Long, 774 F.2d 875 (8th Cir. 1985).  But in Cassidy v. Minihan, 794 F.2d 340, 344 (8th Cir. 1986), our court, after a consideration of the legislative history of the revised act, held that Congress had intended to "allow discharge of liability for injuries unless the debtor intentionally inflicted an injury."

The Sixth Circuit has put the question that is before us this way: Do the words "deliberate or intentional," contained in the legislative reports referred to above, require an "intentional act that results in injury" or "an act with intent to cause injury" before a judgment debt can be exempt from discharge?  Perkins v. Scharffe, 817 F.2d 392, 393 (6th Cir. 1987), cert. denied, 484 U.S. 853 (1987).  Posed this way, we think that the question virtually answers itself.  We do not hesitate to adopt the latter construction, because we believe that it is the more natural way to

-7-

interpret the relevant words.  For one thing, the word "intentional," by itself, will, almost as a matter of natural reflex, cause a lawyer's mind to turn to that category of wrongs known as intentional torts, a category that excludes injuries caused by acts that are merely negligent, grossly negligent, or even reckless.  We presume that when Congress uses a word that has a fixed, technical meaning, it has used it as a term of art.  Second, the word "willful" in the statute (which Congress has said means "deliberate or intentional") modifies the word "injury," so that what is required for nondischargeability is a deliberate or intentional injury, not merely a deliberate or intentional act.  We think it fair to conclude that this means a deliberate or intentional invasion of the legal rights of another, because the word "injury" usually connotes legal injury (injuria) in the technical sense, not simply harm to a person.

Adopting the alternative construction, moreover, would render virtually all tort judgments exempt from discharge.  Every act that is not literally compelled by the physical act of another (as when someone seizes my arm and causes it to strike another), or the result of an involuntary muscle spasm, is a "deliberate or intentional" one, and if it leads to injury, a judgment debt predicated on it would be immune from discharge under the alternative construction of the statute that is posed in Perkins.  Indeed, we see no reason that a knowing breach of contract would not result in a judgment that would be exempt from discharge under this legal principle.  Surely this proves too much.  A person who deliberately and intentionally turns the wheel of an automobile to make a left-hand turn without looking up to see if traffic is coming the other way, an act very likely to lead to injury, however foolish or even reckless he or she may be, simply cannot fairly be described as committing an intentional tort.

We therefore think that the correct rule is that a judgment debt cannot be exempt from discharge in bankruptcy unless it is based on what the law has for generations called an intentional tort, a legal category that is based on "the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, comment a, at 15 (1965). Unless the actor "desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it," he or she has not committed an intentional tort. Id. § 8A at 15.

In our case, there is no suggestion whatever that Dr. Geiger desired to cause the very serious consequences that Mrs. Kawaauhau suffered. So much is conceded. If, therefore, he was an intentional tortfeasor as we have defined that term, he would have to have believed that Mrs. Kawaauhau was substantially certain to suffer harm as a result of his actions. Although the district court opined that "expert testimony" established that Dr. Geiger's conduct was "certain or substantially certain to cause physical harm," that is not enough. There is nothing in the record, so far as we can tell, that would support a finding that Dr. Geiger believed that it was substantially certain that his patient would suffer harm. Indeed, he testified that he believed that Mrs. Kawaauhau was absorbing the penicillin that she was taking orally well enough to effect a cure.

Dr. Halford, moreover, never testified, except in response to a very leading question, that the harm that Mrs. Kawaauhau suffered was a substantially certain consequence of Dr. Geiger's course of treatment. What Dr. Halford said in the main portion of his testimony was that it was a necessary result of that treatment that the infection would "progress at a much more rapid rate and more viciously than otherwise." He also said that, in this case, the treatment "resulted in her requiring amputation to save her life

and in permanent kidney damage," but he did not say that that was a necessary result of the treatment, only, as we understand the testimony, a result of the progress of the infection. We suspect that the course and consequences of an infection are notoriously difficult to predict, but even if Dr. Halford had testified that Dr. Geiger's treatment necessarily (that is, inevitably) led to Mrs. Kawaauhau's injuries, plaintiff's proof still falls short of the mark. As we have indicated, the real question is whether Dr. Geiger believed that these consequences were substantially certain to occur at the time that he attempted his treatment, and the record simply will not support the conclusion that he did. This is an important distinction, one in fact that defines the boundary between intentional and unintentional torts: Even if Dr. Geiger should have believed that his treatment was substantially certain to produce serious harmful consequences, he would be guilty only of professional malpractice, not of an intentional tort.

In the case before us, as our original panel has already noted, "We believe that ... the worst thing that can be said about Dr. Geiger is that he acted recklessly in treating Mrs. Kawaauhau with relatively inexpensive antibiotics that were not as effective as more expensive ones, or in discontinuing antibiotics when he thought that the infection had run its course." In re Geiger, 93 F.3d 443, 444-45 (8th Cir. 1996). It is true, as the district court noted, that Dr. Geiger acted deliberately and intentionally when he pursued this course of conduct, but only an elaborate play on words can transform this behavior into something that is willful and malicious. It is also true that Dr. Geiger testified that he knew that intravenous penicillin was the standard treatment, but a deviation from a standard is not even always negligent, especially if, as may have been the case here, it was induced by the patient herself or Dr. Geiger reasonably believed that it was. Assuming,

without deciding, that Mrs. Kawaauhau did urge Dr. Geiger to cut costs, it is perhaps true that he should have attempted to convince her that she was requesting a very foolish, indeed reckless, economy. We express no view on the duty of physicians in such circumstances, because it is unnecessary to a resolution of this case, and because the existence and scope of such a duty will usually be a matter governed by the established law of some state. Whatever the duty, a breach of it would amount only to a negligent failure to live up to professional standards.

We are aware that other circuit courts have reached legal conclusions that are at odds with our holding in this case. See, e.g., Perkins, 817 F.2d at 394, and In re Franklin, 726 F.2d 606, 610 (10th Cir. 1984). We believe, however, with respect, that these decisions are not well grounded in the statute because they pay insufficient attention to the legislative history of the relevant statutory provisions. They do not, moreover, give appropriate weight to the well-established interpretational rule that exceptions from discharge are to be strictly construed so as to give maximum effect to the policy of the bankruptcy code to provide debtors with a "fresh start." See, e.g., In re Kline, 65 F.3d 749, 751 (8th Cir. 1995), and Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993) (per curiam).

Finally, we observe that in this case we hold only that for a judgment debt to be nondischargeable under the relevant statutory provision, it is necessary that it be based on the commission of an intentional tort. We believe, as we have said, that the debtor's conduct cannot otherwise be said to be "willful." We express no view, however, on the question whether it is sufficient for nondischargeability that the judgment be for an intentional tort. We note in this connection that 11 U.S.C. § 523(a)(6) requires that the injury be both "willful and malicious" before an entitlement to

the exception to discharge arises.  In <u>In re Long</u>, 774 F.2d at 881, we held that for a creditor to establish that the debtor acted maliciously, it was necessary to show that the debtor's conduct was "targeted at the creditor"; and, since the debtor in that case (though he was an intentional tortfeasor) was not acting with a purpose to harm creditors, we concluded that he was not acting maliciously, <u>id.</u> at 882.  Since it is not necessary to a decision in this case that we decide the meaning of the word "malicious" and the bearing, if any, that the interpretation given to that word might have on the dischargeability of a judgment debt, we have no occasion to discuss the matter, and thus we venture no opinion on it.

### III.

In sum, since it is not even alleged that Dr. Geiger intended to inflict an injury on his patient, and it cannot be said that he believed that an injury was substantially certain to result, the judgment underlying this case could not have given rise to a "debt ... for willful and malicious injury by the debtor," <u>see</u> 11 U.S.C. § 523(a)(6).  We therefore reverse the judgment of the district court.

MURPHY, Circuit Judge, with whom McMILLIAN, Circuit Judge, joins, dissenting.

Because the court's reading of 11 U.S.C. § 523(a)(6) goes beyond the language of the statute and its interpretation by other circuit courts, and because it unnecessarily restricts this exception to dischargeability, I respectfully dissent.

Although the court states the question in this case to be whether a medical malpractice judgment debt is dischargeable in bankruptcy, it is more accurately stated to be whether the

particular judgment debt of Dr. Paul Geiger may be discharged.  After a jury trial for medical malpractice in Hawaii, the Kawaauhaus obtained valid state judgments against Dr. Geiger in the total amount of $355,040.  He left Hawaii and settled in St. Louis.  When the Kawaauhaus attempted to collect their judgment in Missouri, Dr. Geiger filed for protection under Chapter 7 of the bankruptcy code.  His only significant debt was the state court judgment awarded to the Kawaauhaus.  After a hearing, the bankruptcy court found that under § 523(a)(6) Dr. Geiger's debt was not dischargeable because it qualified for exception as a willful and malicious injury.  The district court affirmed, concluding that under In re Long, 774 F.2d 875 (8th Cir. 1985), the debt was not dischargeable because Dr. Geiger knew his treatment was substandard and that it was certain or substantially certain to cause Mrs. Kawaauhau harm.

The court reverses because it concludes that Dr. Geiger's actions were not willful "even when [the evidence is] viewed in a light most favorable to the Kawaauhaus," but its recitation of the facts and its discussion of them does not reflect adherence to this principle.

The evidence before us comes from the record made in the bankruptcy court.  At the bankruptcy court hearing the Kawaauhaus offered four exhibits which were accepted into evidence without objection.  These exhibits consisted of evidence from the state trial (portions of the state trial transcript and a report prepared by the Kawaauhaus' expert witness, Dr. Peter Halford, a board certified surgeon), and evidence prepared for the bankruptcy hearing (a deposition and affidavit of Dr. Halford).  Dr. Geiger testified at the hearing on his own behalf, but offered no other evidence.

The bankruptcy court made the following findings of facts. On or about January 4, 1983, Mrs. Kawaauhau sought medical treatment from Dr. Geiger. She had been a patient of his in the past and had numerous medical conditions with which Dr. Geiger was familiar. In this particular instance, she had dropped a box on her right foot, her leg was swollen and red, and pus oozed from beneath the nail of her large toe. She complained of chills, dizziness, pain in the calf, and a fever of 102 degrees the prior evening. She also developed a blister on her right calf. After an initial diagnosis of thrombophlebitis, Dr. Geiger received test results on January 5 and 6 that indicated Mrs. Kawaauhau suffered from a bacterial infection. On January 7, he prescribed oral penicillin. After Dr. Geiger left town on January 8, the doctors who assumed care of Mrs. Kawaauhau immediately started her on intramuscular penicillin and arranged to transfer her to a specialist in Honolulu. When Dr. Geiger returned on January 11, he canceled the scheduled transfer because he thought Mrs. Kawaauhau looked stronger and more alert than when he left, and he also canceled all antibiotics because he thought her infection might be gone, she might develop a superinfection, and her blood was too thin. Her condition deteriorated, and on January 14 the decision was made to amputate her leg below the knee.

Based on his own testimony, the bankruptcy court found that Dr. Geiger knew the proper standard of care for treating an infection like Mrs. Kawaauhau's was intravenous penicillin rather than oral penicillin, and that he knew he was not administering care that met this standard.[1] The court also relied on the expert

---

[1]Dr. Geiger testified in the bankruptcy court that his patient's concern about cost prevented him from administering the proper standard of care. In the state trial, both Mr. and Mrs. Kawaauhau denied they expressed any concern about cost to Dr. Geiger, and this testimony was entered into the bankruptcy court record. Dr. Geiger stated twice at the hearing that he never explained to Mrs. Kawaauhau the cost difference between oral and intravenous penicillin. In response to continued questioning by his attorney, he later stated he did not know if he had discussed the cost difference. The bankruptcy court did not make any specific findings about the conflicting evidence on this point.

-14-

testimony of Dr. Halford that Dr. Geiger's intentional substandard care had caused Mrs. Kawaauhau's infection to progress more rapidly and viciously than it would have otherwise, and that this progression resulted in the amputation of her leg and permanent damage to her kidneys. Dr. Halford expressed the additional opinion that Dr. Geiger had "intentionally administered substandard care to Margaret Kawaauhau that necessarily resulted in advancing infection in her leg, then loss of her leg, and permanent damage to her kidneys."

The court expresses some uncertainty about the proper procedure in a case such as this and whether the focus should be on the state court pleadings or evaluation of the evidence presented to the state jury. A survey of leading cases indicates that sometimes discharge exception issues are resolved by motions for summary judgment.[2] See, e.g., In re Zelis, 66 F.3d 205, 208 (9th Cir. 1995); In re Walker, 48 F.3d 1161, 1163 (11th Cir. 1995).

---

[2]Some motions seek to bar by collateral estoppel the relitigation of factual and legal issues decided in state court. See Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991)(collateral estoppel may apply to dischargeability proceedings under § 523(a)); In re Miera, 926 F.2d 741, 743 (8th Cir. 1991)(willful and malicious issue necessarily decided by state court award of punitive damages).

In this case, unlike Miera, the record does not reveal that the issue of whether Dr. Geiger inflicted a willful and malicious injury was decided in the state court action, and that issue is of course different from the issues of whether Dr. Geiger breached the standard of care he owed Mrs. Kawaauhau or caused her injury, both of which would have been essential to the state judgment. See Restatement (Second) of Torts § 328A (1965 and Supp. 1996).

Willfulness and maliciousness are typically resolved in a case such as this, however, after a hearing in the bankruptcy court which may involve additional evidence.  See e.g., In re Stelluti, 94 F.3d 84 (2d Cir. 1996)(bench trial on dischargeability); In re Stanley, 66 F.3d 664 (4th Cir. 1995)(bankruptcy court hearing on whether actions leading to state court judgment were willful and malicious under § 523(a)(6)); In re Thirtyacre, 36 F.3d 697 (7th Cir. 1994)(evidentiary hearing to determine if actions were willful and malicious); In re Conte, 33 F.3d 303 (3d Cir. 1994)(remand for hearing on whether actions underlying state court verdict were willful and malicious under § 523(a)(6)); In re Pasek, 983 F.2d 1524 (10th Cir. 1993)(bankruptcy court hearing on willful and malicious); In re Franklin, 615 F.2d 909, 911 (10th Cir. 1980)(bankruptcy court not limited to state court record in making dischargeability determination).

The parties here do not challenge the factual findings of the bankruptcy court or the admissibility of the evidence on which it relied. They view the question for this court to be whether the facts found by the bankruptcy court indicate that the injury caused by Dr. Geiger was willful and malicious and whether the judgments assessed against him for that injury is therefore dischargeable.  The factual findings of the bankruptcy court are reviewed for clear error, and its legal conclusions are reviewed de novo.  In re Cent. Ark. Broad. Co., 68 F.3d 213, 214 (8th Cir. 1995)(per curiam).  I believe a careful review shows that the bankruptcy court's findings are not clearly erroneous and that they are supported in the record.

The statutory provision controlling the question of discharge in this case, 11 U.S.C. § 523(a)(6), bars discharge in bankruptcy of any debt "for willful and malicious injury by the debtor. . . ."  If the intent of Congress is clear from the text of the statute, no

further inquiry is necessary.  <u>Good Samaritan Hosp. v. Shalala</u>, 113 S. Ct. 2151, 2157 (1993); <u>Arkansas AFL-CIO v. F.C.C.</u>, 11 F.3d 1430, 1140 (8th Cir. 1993)(en banc).  The legislative history is consulted only if that intent cannot be discerned from the plain language.  <u>Arkansas AFL-CIO</u>, 11 F.3d at 1140.

The court finds it unnecessary to decide the meaning of "malicious" because of its treatment of "willful."  The statute does not define "willful," but when Congress uses a term of art, that term is accorded its established meaning.  <u>McDermott Int'l, Inc. v. Wilander</u>, 498 U.S. 337, 342 (1991).  According to Prosser and Keeton, "[t]he usual meaning assigned to 'willful' . . . . is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow . . ."  W. Page Keeton et al., <u>Prosser and Keeton on the Law of Torts</u> § 34, at 213 (5th ed. 1984).  Although the meaning of "willful" can be influenced by its context, in civil actions the word is commonly used for an act which is intentional, knowing, or voluntary, as distinguished from accidental.  <u>Screws v. United States</u>, 325 U.S. 91, 101 (1945); <u>United States v. Murdock</u>, 290 U.S. 389, 394 (1933).  Only when used in a criminal context does it generally mean an act done with bad purpose.  <u>Screws</u>, 325 U.S. at 101; <u>Murdock</u>, 290 U.S. at 394.

The Supreme Court has had only one occasion to discuss the meaning of willful and malicious in the statutory section on exceptions to discharge and that was in <u>Tinker v. Colwell</u>, 193 U.S. 473 (1904).  In <u>Tinker</u>, the Court interpreted "willful and malicious" in this way:

> a wilful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of

> itself, and which necessarily causes injury and is done intentionally, may be said to be done wilfully and maliciously, so as to come within the exception.

Id. at 487. The Kawaauhaus argue that Tinker is still good law because it has never been overruled or modified by any subsequent Supreme Court case, but Dr. Geiger argues that the legislative history of the new bankruptcy code shows Congress intended in it to override Tinker.

In the bankruptcy code enacted in 1978 Congress made no change in the wording of this exception to discharge, but the more than 700 pages of associated committee reports make brief reference to the meaning of § 523(a)(6). See S. Rep. No. 95-989, at 79 (1978), reprinted in, 1978 U.S.C.C.A.N. 5787, 5865, and H.R. Rep. No. 95-595, at 365 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6320-21. The reports comment:

> "[W]illful" means deliberate or intentional. To the extent that Tinker v. Colwell (citation omitted) held that a [looser (House version); less strict (Senate version)] standard is intended, and to the extent that other cases have relied on Tinker to apply a "reckless disregard" standard, they are overruled.

Id. This commentary reveals several things, but also raises additional questions. It indicates that "willful means deliberate or intentional" and that § 523(a)(6) calls for something more than reckless disregard. While it indicates some uncertainty as to what Tinker actually held, any reading of it to mean only reckless disregard is overruled. The commentary does not define a

heightened standard, however, or how the words intentional and deliberate should be understood.[3]

This legislative history does not call for the interpretation adopted today by the court -- that Congress intended "willful" to incorporate subjective specific intent to injure and to restrict the application of § 523(a)(6) to intentional torts. In reaching its conclusion, the court relies on the definition of intent found in the Restatement (Second) of Torts § 8A (1965). The court reads this section to mean that intent can only be shown by proof of the subjective desire to injure or the subjective belief that injury is substantially certain to occur, but comment b notes:

> Intent is not . . . limited to the consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.

As Judge Becker points out in In re Conte, even if one accepts the Restatement definition as controlling, actions which in an objective sense are substantially certain to cause harm can be considered willful and malicious. 33 F.3d at 307-08.

_____

[3]As the Third Circuit has noted:

> While this legislative history excludes recklessness [as a definition of "willful"], it does not state exactly what is required. The bankruptcy courts that have decided this matter have been divided as to whether the statute requires an intentional act that results in injury or an act with intent to cause injury. (Citations and quotations omitted). Moreover, the meaning of either of these two interpretations is not self-evident.

In re Conte, 33 F.3d at 306.

In reenacting the discharge section of the Bankruptcy Act of 1898 in the code adopted in 1978, Congress used terminology in § 523(a)(6) identical to the language interpreted by the Supreme Court in Tinker. Congress could have worded the section to require specific intent to injure or an intentional tort if that was its intent, but it did not. The legislative history also does not do either; it does not mention intentional torts or say what is meant by "deliberate or intentional." Comments in committee reports do not necessarily control meaning, see, e.g., Pierce v. Underwood, 487 U.S. 552, 567-68 (1988),[4] but subsequent to the enactment of the new bankruptcy code courts have tried to conform to the points raised in the legislative history. The variety of formulations which have resulted grow out of the lack of clarity in the committee comments.

No other circuit interprets the statute or the legislative history to require proof of a subjective intent to injure or proof of an intentional tort.[5] The court describes its understanding of

---

[4]In Pierce a less restrictive and "naturally conveyed" meaning was adopted rather than one directed by committee comments determined not to be an authoritative expression of the meaning of a phrase. Id. at 565-68.

[5]Even when the acts of the debtor could be characterized as intentional torts, other circuits have not required that a debt result from an intentional tort judgement in order to prevent discharge. See, e.g., In re Stelluti, 94 F.3d at 88; In re Stanley, 66 F.3d at 667-68.

The court is not clear about what its requirement of an intentional tort means. If the intent were to restrict § 523(a)(6) to debts resulting from a judgment for an intentional tort, it would add an unprecedented substantive and procedural limitation to this section by requiring parties to obtain a judgment before initiating an adversary proceeding to prevent discharge. If, on the other hand, the court only means to restrict § 523(a)(6) to conduct that can be characterized as intentional torts, it is inviting parties to litigate state tort actions in the bankruptcy court. For example, in this case, the Kawaauhaus could plausibly argue that Dr. Geiger's actions amounted to battery. See Restatement (Second) of Torts §§ 18-20 (1965).

the statute as the "natural" meaning, with very little reference to the reasoning and analysis of the circuits which have reached different results. Courts draw varying meanings from the use in § 523(a)(6) of the language construed in <u>Tinker</u> and the legislative history behind it. While several other courts recognize evidence of specific intent to injure as one way to meet the statutory standard, none absolutely require it.

The First, Third, Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits all employ a standard that prevents discharge of a debt if the debtor's act could be predicted to produce the injury suffered by the creditor, but the precise wording of the standard varies. The Sixth Circuit construes willful to apply to an act done intentionally which necessarily produces harm, and malicious to mean wrongful, without just cause or excuse, or excessive. <u>Vulcan Coals, Inc. v. Howard</u>, 946 F.2d 1226, 1228-29 (6th Cir. 1991), (citing <u>Perkins v. Scharffe</u>, 817 F.2d 392, 394 (6th Cir.), <u>cert. denied</u>, 484 U.S. 853 (1987)). Similarly, the Ninth Circuit, reading willful and malicious together, requires an act done intentionally that necessarily produces harm without just cause or excuse. <u>In re Zelis</u>, 66 F.3d at 208. The Third Circuit standard for willful and malicious is an act done intentionally which is "substantially certain to result in injury or where the debtor desired to cause injury." <u>In re Conte</u>, 33 F.3d at 308. The Eleventh and Fifth Circuits, like the Third, require proof of an intentional act with the purpose to cause injury or one which is substantially certain to cause injury. <u>In re Delaney</u>, 97 F.3d 800, 802 (5th Cir. 1996)(per curiam); <u>In re Walker</u>, 48 F.3d at 1165.

Two circuits use somewhat different terminology, but their focus on the foreseeability of the injury is similar to the examination required by other circuits. In the Tenth Circuit, there will be no discharge if the debtor acts "knowing full well that his conduct will cause particularized injury." In re Pasek, 983 F.2d 1527. Creditors "are not restricted to direct evidence of specific intent to injure in satisfying the requirements of § 523(a)(6) . . . 'the debtor's actual knowledge or the reasonable foreseeability that his conduct will result in injury to the creditor' are highly relevant." Id. (citations omitted). In the First Circuit, "the term 'willful and malicious' in § 523(a)(6) means an act intentionally committed, without just cause or excuse, in conscious disregard of one's duty and that necessarily produces an injury." Printy v. Dean Witter Reynolds, Inc., No. 96-2195, 1997 WL 160122, at *7 (1st Cir. Apr. 10, 1997)(citation omitted).

The standards in the remaining circuits which have ruled on the question vary, but none requires intent to produce the injury. In the Second Circuit the standard requires an intentional and deliberate act which is wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will. In re Stelluti, 94 F.3d at 88. In the Fourth Circuit a debtor's injurious act, done deliberately and intentionally, in knowing disregard of the rights of the other, is sufficiently willful and malicious to prevent discharge, even if a debtor bears a creditor no subjective ill will or specific intent to injure. In re Stanley, 66 F.3d at 667. The Seventh Circuit has concluded that § 523(a)(6) does not require specific intent to injure in order to prevent discharge, but it has not developed a definition beyond that. In re Thirtyacre, 36 F.3d at 701.

The only other circuit to rule on the dischargeability of a medical malpractice debt under § 523(a)(6)[6] declined to discharge the physician's debt on facts very similar to those in this case. In <u>Perkins</u> the doctor had unnecessarily injected the patient's foot with an unsterile needle, failed to perform timely tests on the resulting infection, subsequently ignored the belated test results, and failed to hospitalize the patient when hospitalization was necessary. The court, citing the leading bankruptcy treatise, employed the standard of "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse" and concluded that it was met by the facts. <u>Perkins</u>, 817 F.2d at 394 (citing 3 <u>Collier on Bankruptcy</u> 523-111 (15th ed. 1986)).

Dr. Geiger's debt should similarly not be discharged. It is not necessary in this case to consider whether the <u>Perkins</u> standard or one of the other circuit definitions of willful and malicious is most appropriate in light of the legislative history and policy because even under <u>In re Long</u> the debt is not subject to discharge.

Until today this court's construction of the statute, although more restrictive than some, was generally within the range of interpretations found in other circuits. Many of our previous cases use a standard for § 523(a)(6) which was articulated in <u>In re Long</u>, 774 F.2d at 881. <u>See</u> <u>In re Waugh</u>, 95 F.3d 706, 711 (8th Cir. 1996); <u>In re Miera</u>, 926 F.2d at 743-44. <u>In re Long</u> concluded "willful" meant conduct which was "headstrong and knowing," and "malicious" meant "targeted at the creditor", at least in the sense that the injury is certain or almost certain to occur. <u>Id.</u> at 881.

---

[6]The Tenth Circuit has also addressed the dischargeability of a medical malpractice judgment, but that case was applying the "willful and malicious injury" section of the Bankruptcy Act of 1898. <u>See</u> <u>In re Thurman</u>, 901 F.2d 839, 841 (10th Cir. 1990) (discussing <u>In re Franklin</u>, 726 F.2d 606 (10th Cir. 1984)).

-23-

Since "intentional harm may be very difficult to establish, the likelihood of harm in an objective sense may be considered in evaluating intent." <u>Id.</u> Although the court cites <u>In re Long</u> in support of its conclusion granting discharge, it actually enunciates a significantly more restrictive standard.[7]

Dr. Geiger's debt should not be discharged under <u>In re Long</u> because his admitted administration of substandard care shows an almost certain likelihood of harm resulting from headstrong and knowing acts. The bankruptcy court found that Mrs. Kawaauhau reported to Dr. Geiger complaints of fever and a swollen foot which was oozing pus. After receiving test results that changed his initial diagnosis from thrombophlebitis to one of infection, Dr. Geiger knew the most effective treatment was intravenous penicillin, and yet he prescribed oral penicillin. He then traveled away and left his patient in the care of other doctors who switched Mrs. Kawaauhau to intramuscular penicillin and Moxam and authorized a transfer to a specialist. When he returned, Dr. Geiger noted that Mrs. Kawaauhau appeared to be doing better after his absence. He chose to terminate her intramuscular treatment, however, to cancel the transfer to a specialist, and to discontinue

---

[7]The court also cites <u>Cassidy v. Minihan</u>, 794 F.2d 340 (8th Cir. 1986), which held that an injury caused by a drunk driver was not an intentional injury and therefore the debt was dischargeable. <u>Cassidy</u> considered the legislative history connected with the enactment of the bankruptcy code and determined that "Congress intended to bar the discharge of intentionally inflicted injuries," <u>id.</u> at 344, but it did not consider by what standard such intent would need to be shown and it did not have the benefit of the many other circuit discussions which have issued since 1986.

Subsequent to the events giving rise to <u>Cassidy</u>, Congress amended the statute to bar discharge of debts arising from drunk driving accidents, <u>see</u> 11 U.S.C. § 523(a)(9) (1997), illustrating that Congress can easily amend the statute if it is unhappy with its interpretations.

all antibiotics only four days after starting them.  Dr. Geiger admits he knew his care was substandard, and the uncontested expert testimony was that his intentional substandard care harmed Mrs. Kawaauhau.  The district court did not err in concluding that the evidence and the findings of the bankruptcy court prevent discharge under In re Long.

Interpreting § 523(a)(6) to require an intentional tort and proof of a specific intent to injure does not further the policy underlying this section.  Section 523(a) makes it clear that Congress did not intend all debts to be forgiven, notwithstanding its general policy of allowing a debtor a "fresh start."  See Miera, 926 F.2d at 745.  It intended to relieve honest and unfortunate debtors.  In re Molitor, 76 F.3d 218, 220 (8th Cir. 1996).  The same House report cited by the court notes one purpose of the 1978 amendments was to provide a more effective remedy for the "unfortunate consumer debtor."  H.R. Rep. No. 95-595, at 4, reprinted in 1978 U.S.C.C.A.N. at 5966.  Examples given of "unfortunate consumer debtors" include families suffering from a serious illness, unemployment, or aggressive consumer creditors.  H.R. Rep. No. 95-595, at 116, reprinted in, 1978 U.S.C.C.A.N. at 6077.  While examples listed in a committee report should not be regard as exhaustive, Dr. Geiger can hardly be characterized as an unfortunate consumer debtor.  He is a medical doctor who knowingly administered substandard care to his patient.  He was found by a jury to have committed malpractice, but he did not carry malpractice insurance. He had no other debts than the malpractice judgment and filed his petition for bankruptcy to avoid payment of that judgment.  The unfortunate consumer in this case could easily be seen to be on the opposite side from the debtor.

By enacting the exceptions to discharge, Congress has specified that some debtors may disentitle themselves to relief,

but the court's definition of "willful" is so narrow that it would defeat the purpose of § 523(a)(6) by restricting it to intentional torts or the unusual circumstance where a debtor is "foolhardy enough to make some plainly malevolent utterance expressing his intent to injure his creditor" or to express the belief that injury was substantially certain to follow. In re Conte, 33 F.3d at 308 (citation omitted). Requiring proof of a subjective intent to harm "would undermine the purposes of [§ 523(a)(6)] and place a nearly impossible burden on a creditor who wishes to show that a debtor intended to do him harm." In re Conte, 33 F.3d at 308(citation omitted); see also In re Long, 774 F.2d at 881.

The court has greatly expanded the meaning and significance of the few words in the legislative history and has established a new standard that differs from the practice in the nine other circuits which have examined the section. Seven circuits utilize a definition which includes an intentional act substantially certain to lead to injury or one that would necessarily lead to it.[8] Two circuits use what might be characterized as a knowing disregard standard, and one has ruled only that the statute does not require specific intent. To the extent uniform interpretation of the bankruptcy code is seen as a policy goal, the court today does nothing to further it. See e.g., Perkins, 817 F.2d at 395 (Engel J. concurring).

There is no reason to create a special shield for medical malpractice judgments without a showing that Congress intended to exempt this category of debts from the reach of § 523(a)(6). Just as with other types of debts, the facts of the case must be

---

[8]Three of these also have an alternative standard similar to the court's requirement of purpose to cause injury, but they do not limit the creditor to this option alone.

examined in order to decide the issue of discharge. Nondischarge of Dr. Geiger's debt would not mean that all other malpractice judgment debts could not be discharged.[9]  Dischargeability depends on the facts of the individual case and whether the proof rises above reckless disregard of the rights of the creditor, whether proven by subjective intent to injure or by objective probability that the injury was necessarily or substantially certain to follow from the intended act.[10]

The findings and record here show conduct that was more than reckless, specifically the knowing administration of substandard care that was substantially certain to cause injury.  Absent "a very obvious and exceptional showing of error," this court is not free to reevaluate the evidence presented in the bankruptcy court.  Judge v. Prod. Credit Ass'n of the Midlands, 969 F.2d 699, 700 (8th Cir. 1992)(per curiam); see also In re Exec Tech Partners, 107 F.3d 677, 680 (8th Cir. 1997).[11]  Since Dr. Geiger inflicted a willful

_____

[9]Several other red herrings have also been raised.  The court's suggestion that a different result in this case would lead to an interpretation of § 523(a)(6) that would cover even a breach of contract has no support in the record.  Neither does the statement at oral argument by counsel for Dr. Geiger that failure to discharge his debt would lead to higher malpractice insurance rates.

[10]An act that will necessarily lead to harm is the equivalent of one substantially certain to do so because "all effects are probablistic" and it cannot be predicted that a particular result is certain or necessary.  In re Conte, 33 F.3d at 308 n.2.

[11]Unlike the bankruptcy judge who was the trier of fact, the court believes that Dr. Halford's expert testimony only shows that Dr. Geiger's treatment resulted in the worsening of Mrs. Kawaauhau's infection, not that it necessarily led to any other injury to her.  It bases this distinction on its suspicion that the course of an infection is notoriously difficult to predict.  In contrast, the bankruptcy court found that Dr. Geiger's treatment led to the worsening of Mrs. Kawaauhau's condition and the eventual amputation of her leg.  Even if there are two reasonable interpretations of the evidence, this court is required to defer to the bankruptcy court's findings absent clear error.  In re LeMaire, 898 F.2d 1346, 1349 (8th Cir. 1990).

and malicious injury within the meaning § 523(a)(6), I would affirm the judgment denying the discharge of his debt to the Kawaauhaus.

    A true copy.

        Attest:

            CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.