**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: JKJ CHEVROLET,
INCORPORATED,
<u>Debtor.</u>

FORD MOTOR CREDIT COMPANY,
<u>Plaintiff-Appellant,</u>

No. 96-1836

v.

JKJ CHEVROLET, INCORPORATED,
<u>Defendant-Appellee.</u>

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Chief District Judge.
(CA-96-167-A, BK-91-14535-AB)

Argued: May 9, 1997

Decided: July 21, 1997

Before HALL, WILKINS, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** George Richard Pitts, DICKSTEIN, SHAPIRO, MORIN
& OSHINSKY, L.L.P., Washington, D.C., for Appellant. John Ber-
nard Connor, JOHN B. CONNOR, P.L.C., Alexandria, Virginia, for

Appellee. **ON BRIEF:** Guy S. Neal, DICKSTEIN, SHAPIRO, MORIN & OSHINSKY, L.L.P., Washington, D.C., for Appellant.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Ford Motor Credit Company (Ford) appeals the judgment of the district court affirming the bankruptcy court's order that it pay $209,179.51 in commissions, salaries, and other benefits to former employees of JKJ Chevrolet, Inc., for work they performed during the pendency of JKJ's Chapter 11 bankruptcy. We affirm.

I.

JKJ was a large automobile dealership in northern Virginia. On October 21, 1991, it filed for bankruptcy reorganization under Chapter 11. Ford was JKJ's largest creditor; it provided most of JKJ's product inventory on consignment, in return for a security interest in virtually all of the dealership's assets. At the time of the bankruptcy petition, JKJ's assets were worth about $6 million less than the amount it owed to Ford.

JKJ and Ford agreed to a series of consent orders permitting JKJ to retain some of the cash that it obtained from the sale of Ford's collateral so that it might continue to operate its business. The last of these consent orders, filed in the bankruptcy court on February 18, 1992, and set to expire at noon on March 10, 1992, provided that JKJ would turn over to Ford the loan balance or wholesale cost of each vehicle that it sold. In turn, JKJ was allowed to retain the profits from the sales as "available cash collateral," and to use those profits (along with those realized from other departments within the dealership) to operate its business, but only so long as the aggregate value of Ford's

2

collateral continued to equal or exceed that existing on the date of the bankruptcy petition. In the event of a "collateral shortfall," JKJ would have three days to cure the situation by transferring funds from other accounts, else Ford would be granted relief from the automatic stay and would be entitled to pursue all appropriate remedies.[1]

JKJ was sold as a going concern at the expiration of the final consent order on March 10, 1992. On that date, it had approximately $68,000 in its bank accounts. In addition, there was a payment due from General Motors Corporation in the amount of $188,142.75. JKJ owed its employees a total of $209,179.51 in commissions and salaries they earned during the course of the preceding month; indeed, the paychecks had already been written for distribution on Friday, March 13. Instead, the checks -- along with the payment from GM -- were seized by Ford, and it refused to pay the employees.

On April 16, 1992, JKJ filed a motion in the bankruptcy court to direct Ford to pay the past due wages. Following hearings and arguments on the matter, both initially and on remand from the district court, the bankruptcy court entered orders on January 25, 1993, and December 12, 1995, which granted JKJ the relief that it had requested. Ford appealed to the district court, which, on May 8, 1996, entered a final order affirming the judgment of the bankruptcy court. Ford appeals.

II.

A.

A debtor-in-possession may not use, sell, or lease cash collateral, i.e., the proceeds from the liquidation of an asset in which a creditor has a security interest, for any purpose unless either (1) the creditor consents or (2) the bankruptcy court, after notice and a hearing, authorizes the transaction. 11 U.S.C. §§ 363(a),(c)(2). Ford consented to the use of its cash collateral by JKJ, but that consent expired on

_____

[1] The consent order, among other things, also granted Ford a security interest in all of JKJ's assets acquired post-petition, and it permitted Ford to maintain an on-site representative to monitor the dealership's day-to-day operations.

March 10, 1992, three days before the employees were scheduled to be paid. Clause 14(f) of the consent order provides, in pertinent part:

> Debtor . . . shall pay, but only from Available Cash Collateral, all post-petition wages, employee benefits and employer contributions to benefit plans when due[.]**2**

According to Ford, the employees' wages were not"due" until March 13, 1992, JKJ's regularly scheduled payday. Ford contends that, inasmuch as its consent to JKJ's use of its cash collateral had by then been withdrawn, the payment of these wages would require the approval of the bankruptcy court. The court, in turn, could not approve the payment unless it first found that Ford would remain "adequately protected." <u>See</u> 11 U.S.C. § 363(e) ("on request of an entity that has an interest in property used, sold, or leased, . . . the court . . . shall prohibit such use, sale, or lease as is necessary to provide adequate protection of such interest.").

The concept of adequate protection is an amorphous one, but, in essence, it means that the value of a creditor's interest in the property securing the debt owed to him may not be diminished. A secured creditor may be adequately protected by (1) the transfer of cash to the creditor from other estate assets to compensate for the collateral's diminution in value; (2) the provision of a replacement lien in another asset of the estate; or (3) the grant of such other relief as will result in the creditor realizing the "indubitable equivalent" of his interest in the collateral. <u>See</u> 11 U.S.C. § 361.

The bankruptcy court, on remand from the district court, found that Ford would be adequately protected if it were compelled to pay the wages, notwithstanding that it would receive nothing in return. We need not, however, debate the accuracy of this finding. We conclude that, inasmuch as the wages were "due" no later than when JKJ ceased

_____

**2** Though the parties do not appear to dispute the point, we note that it could be argued that the words "when due" modify only the immediately preceding phrase "employer contributions to benefit plans." Interpreted in such a way, the clause could be logically construed to require JKJ to pay all post-petition wages and employee benefits regardless of when they came "due."

4

operations, see Section II.B.1. infra , they were required by the terms of the consent order to be paid as long as available cash collateral existed to cover the expense. The bankruptcy court found that the funds in JKJ's bank accounts and those represented by the GM check were available cash collateral. Because that finding is not clearly erroneous, it must stand.

B.

1.

Nothing in the consent order purports to define the word "due," as it is used in Clause 14(f). Out of context, the word is inherently ambiguous. Any meaning that may be ascribed to it must therefore derive from the common expectations of JKJ and its employees within the context of their employment relationship.

Ford insists that the dealership and its employees expected that the latter would be paid on a certain date, and, therefore, that those wages would not be "due" until then. More basic to the employment relationship, however, than the employees' expectation that they would be paid on a certain date is their expectation that they would be paid. For example, had JKJ simply ceased operations instead of declaring bankruptcy, it could not have avoided its obligation to compensate its employees for accrued wages simply because payday had not yet arrived. In such a case, absent an agreement to the contrary, the wages would presumably be "due" on the day the business closed its doors.

Absent a specific provision in the consent order, no different result should obtain in this case. The law is well settled, in Virginia and elsewhere, that "[w]hen an ambiguity exists, a court will construe a contract more strictly against the party who prepared it." Mahoney v. NationsBank of Va., N.A., 455 S.E.2d 5, 9 (Va. 1995) (citation omitted). Because Ford was wholly responsible for drafting the consent order, it must abide by the construction of the word"due" in Clause 14(f) that is most favorable to the contract's beneficiaries, so long as that construction is reasonable.

Interpreting Clause 14(f) to mean that the employees' wages became "due" upon the cessation of JKJ's business is consistent with

5

the reasonable expectations of all of the parties involved. The terms of the consent order itself, then, permitted the payment of the wages, to the extent that available cash collateral existed to pay them.

2.

Ford maintains that the $256,000 represented by the closing cash on hand and the GM payment was not available cash collateral, because, it says, the value of its collateral had plummeted since the filing of the petition, creating a collateral shortfall. The evidence of this supposed shortfall was provided by Frederic R. Miller, an accountant with Coopers & Lybrand, who testified that, by February 22, 1992, Ford's collateral was worth $432,983 less than it had been four months earlier.

Miller acknowledged, though, that "one of the biggest source[s] of the differences" was the recognition of certain pre-petition losses in the post-petition period. These losses made JKJ's post-petition performance look much worse than it actually was, because they were not subtracted from the initial calculation of the collateral's value. Such an approach likely makes accounting sense, but we doubt very much that starting off a few hundred thousand dollars in the hole is what JKJ contemplated when it agreed to the terms of the consent order. Indeed, had Ford believed that the dealership was performing so poorly, it could have shut JKJ down on February 22, as the putative "collateral shortfall" would have entitled it to do.

The bottom line is that Ford's collateral position on October 21, 1991, vis-a-vis its position on March 10, 1992, was, in light of the evidence before the bankruptcy court, fairly subject to interpretation. It was not clear error for that court to find that the value of Ford's collateral had not diminished since the onset of JKJ's bankruptcy. See In re Stanley, 66 F.3d 664, 667 (4th Cir. 1995) ("[W]e may not, generally speaking, set aside a finding of fact made by the bankruptcy court unless it is clearly erroneous."). From that premise, we must accept the bankruptcy court's conclusion that available cash collateral existed to pay JKJ's employees, and that Ford must now make good on the dealership's wage obligations.

6

III.

The judgment of the district court is affirmed.

AFFIRMED

7