**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LEGEND RADIO GROUP, INCORPORATED,
Debtor-Appellant,

v.

CRAIG SUTHERLAND; RITA
SUTHERLAND; RICHARD EDWARDS;

No. 98-1720

SOUTHERN COMMUNICATIONS,
INCORPORATED,
Creditors-Appellees,

U. S. TRUSTEE,
Trustee-Appellee.

BRISTOL BROADCASTING COMPANY,
INCORPORATED,
Plaintiff-Appellee,

No. 99-1639

v.

LEGEND RADIO GROUP, INCORPORATED,
Debtor-Appellant.

In Re: LEGEND RADIO GROUP,
INCORPORATED,
<u>Debtor.</u>

BRISTOL BROADCASTING COMPANY,

No. 99-1640

INCORPORATED,
<u>Plaintiff-Appellee,</u>

v.

LEGEND RADIO GROUP, INCORPORATED,
<u>Debtor-Appellant.</u>

Appeals from the United States District Court
for the Western District of Virginia, at Abingdon.
Glen M. Williams, Senior District Judge.
(CA-97-165-A, BK-94-1461-7-HPA, CA-98-192-A, CA-98-195-A)

Argued: December 1, 1999

Decided: April 7, 2000

Before WILLIAMS, MICHAEL, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Michel Lamie, BROWNING & LAMIE, P.C.,
Abingdon, Virginia, for Appellant. Patrick Louis Hayden,
MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Norfolk, Vir-
ginia, for Appellees. **ON BRIEF:** Robert W. McFarland, Dion W.
Hayes, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Nor-
folk, Virginia; Fred M. Leonard, Bristol, Tennessee, for Appellee

Bristol Broadcasting; Mark L. Esposito, PENN, STUART & ESKRIDGE, Bristol, Virginia, for Appellee Edwards; David J. Hutton, BOUCHER, HUTTON, KELLY & GRAHAM, P.C., Abingdon, Virginia, for Appellee Southern Communications.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Legend Radio Group, Inc., the debtor in this Chapter 11 bankruptcy proceeding, appeals two rulings of the district court. The first, memorialized by the district court's order of April 14, 1998, affirmed the bankruptcy court's confirmation of a creditor's plan to sell the assets of the bankruptcy estate. The second, entered approximately one year later on limited remand from this court, denied Legend's motion for modification of the confirmed plan. We conclude that the district court did not err in either ruling, and we therefore affirm.

I.

A.

Legend owns radio stations WABN-AM and WABN-FM, both of which broadcast from studios in Abingdon, Virginia. On June 28, 1994, Legend filed a voluntary petition for Chapter 11 reorganization, listing just over $120,000 in assets and about $460,000 in liabilities. The largest secured creditors were Southern Communications, Inc. (Southern), the company that had sold the stations to Legend in 1987, and Dickenson Buchanan (now Premier) Bank.[1] The amounts owed

_____

[1] Southern had a first deed of trust against Legend's real estate, and Premier's loan was secured by a lien against all of Legend's equipment.

3

to Southern and Premier accounted for more than eighty percent of Legend's total liabilities.

Among the larger unsecured creditors were Richard Edwards and his father, Olney, who had formed Legend in association with Craig and Rita Sutherland. The Edwardses had conveyed their ownership interest in the company to the Sutherlands in accordance with a 1992 court settlement. Richard Edwards, however, had a continuing interest in Legend's ability to operate at a profit. Not only was he an unsecured creditor, but he had also pledged substantial personal assets as collateral for Legend's loan from Premier Bank. In the wake of the bankruptcy petition, Edwards was required to make the loan payments to prevent Premier from seizing the collateral.

Following the bankruptcy court's rejection of Legend's initial plan of reorganization, Edwards submitted his own plan (the "Edwards Plan") providing for the sale of Legend's assets (the radio stations and associated property) to Bristol Broadcasting Co., Inc. ("BBCI") at a price of $335,000. See 11 U.S.C. § 1121 (governing the filing of reorganization plans by the debtor and other parties in interest). The bankruptcy court rejected the original Edwards Plan, as well as a modified version of Legend's initial plan (the "Legend Plan"). With respect to the Edwards Plan, the court expressed its concern that Southern and Premier would receive a sum certain in partial satisfaction of their claims, without regard to the actual value of the collateral securing the debt.[2] The bankruptcy court was further concerned that there had been

_____

[2] The Edwards Plan, as originally submitted, stipulated that Southern's secured claim would be paid "to the extent of the value of its collateral, ($150,000)." The plan made no similar representations concerning the value of the equipment securing Legend's debt to Premier, see supra note 1, but it nonetheless provided for the payment of $75,000 to extinguish the secured portion of Premier's claim. Both of these creditors were acknowledged to be "impaired" under the plan, see 11 U.S.C. § 1123(a)(3), which meant that any debt determined to be owing beyond the above-mentioned amounts would be treated as an ordinary unsecured claim, for which Southern and Premier would not receive full remuneration.

The bankruptcy court criticized the Edwards Plan as "propos[ing] grossly disparate treatment among unsecured creditors." In other words,

4

"no objective valuation of the real estate and the business" to assist it in gauging the adequacy of the proposed sale price.

Thereafter, Edwards amended his plan slightly and resubmitted it. The only substantive change related to the treatment of Premier, which had previously been slated to receive a flat $75,000 for the secured portion of its claim. Under the amended plan, the bankruptcy court would instead decide the amount of Premier's secured claim; if the debt to Premier exceeded the value of Legend's collateral as determined by the court, Premier would have an unsecured claim for the balance.

On March 18, 1997, the bankruptcy court conducted a confirmation hearing on the Edwards Plan, as amended. During this proceeding, the court heard the testimony of George I. Otwell, the managing director of a national media brokerage firm. Otwell's firm, at the behest of Edwards, had prepared a valuation analysis of WABN-AM and WABN-FM. Otwell testified that the fair market value of the radio stations was $275,000, considerably less than the $335,000 already offered by BBCI and placed in escrow. At this same hearing, however, counsel for Legend represented that another broker, retained by the Sutherlands, had recently appraised the stations at $690,000. On

_____

the plan did not account for the possibility that the value of the collateral securing the loans from Southern and Premier might turn out to be less than $150,000 and $75,000, respectively. In that event, the portion of those creditors' claims representing the difference between the fixed pay-out and the (lesser) actual value of the collateral would have been repaid dollar for dollar, notwithstanding the unsecured status of that portion of the claims. As the bankruptcy court correctly noted,"[t]his alone is objectionable[;] since these amounts are subject to change and since unsecured creditors are not paid in full, the value of those claims must be determined under 11 U.S.C. § 506." Id. at 2-3. Section 506 requires the value of the collateral to be calculated "in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting [the secured] creditor's interest." 11 U.S.C. § 506(a). The statute thus contemplates that the valuation issue will, in most cases, be subjected to the adversary process, with the ultimate determination made by the court.

5

the strength of that valuation, Legend had been working with the Small Business Administration ("SBA") to obtain a bank loan of sufficient size to permit the stations to become current with their creditors. Confronted with this new development, the court continued the confirmation hearing and permitted Legend to further modify and resubmit its plan.

On May 27, 1997, the proceedings resumed with the latest versions of the Edwards Plan and the Legend Plan both before the bankruptcy court for confirmation. The court heard the testimony of Charles A. Dick, the Sutherlands' expert, in support of his $690,000 appraisal. One basis for his valuation, Dick explained, was the ever-increasing demand for the limited number of available broadcasting licenses, the vast majority of which are obtained by the sale of existing stations. A second basis, according to Dick, was that a broadcaster's "area of influence" extends beyond that covered by its primary signal, due in large part to the mobility of the listening audience. A significant portion of the population, for example, commutes a considerable distance between home and work, either of which might be within the signal range. Under this analysis, the area of influence for WABN-AM and WABN-FM extends at least thirty miles beyond the effective reach of the stations' signals, encompassing the lucrative Tri-Cities market of northeastern Tennessee. Other factors entered into Dick's valuation calculus, including Legend's ownership of the real estate on which its studios and broadcast tower are situated. Legend had been deriving income from its tower by leasing antenna and transmitter space to providers of cellular telephone and paging services. On cross-examination, Dick admitted that his appraisal was heavily influenced by the stations' potential as a profitable enterprise -- a potential that in his opinion had not been fully realized:

> Q. Your opinion as to the $690,000 figure . . . does not address what the value of this station is today, the way it is being run today by existing management . . .?
>
> A. On the cash flow basis, you are 100 percent right.

The bankruptcy court rejected the Legend Plan, concluding that it proposed payments to the estate's creditors over an unduly protracted period (more than eleven years) and that it offered little chance of

6

success in any event. The court noted further that insofar as the Legend Plan permitted the Sutherlands to retain an equity interest in the business while payment of the unsecured claims languished, the plan violated the "absolute priority rule."**3** The Edwards Plan, by contrast, would divest the Sutherlands of their ownership rights and provide for the prompt disbursement of the $335,000 generated by the sale of the business to BBCI. The proceeds would infuse significantly more cash into the estate than the maximum new debt of $200,000 that the SBA would guarantee under the Legend Plan. This latter fact had apparently not been lost on the creditors, each class of which voted in favor of the Edwards Plan. The bankruptcy court found the Edwards Plan to meet all of the statutory requirements for confirmation. See 11 U.S.C. § 1129. Accordingly, on September 5, 1997, the court entered an order confirming that plan.

B.

Legend appealed the bankruptcy court's order confirming the Edwards Plan to the district court, which affirmed the bankruptcy court on April 14, 1998. Legend then filed a timely notice of appeal to this court, which was docketed as No. 98-1720. Shortly thereafter, we ordered a limited remand for the bankruptcy court to permit Legend to file a motion to modify the Edwards Plan, pursuant to 11 U.S.C. § 1127(b). The proposed "modification" was an offer from investor Don Nicewonder (the "Nicewonder Plan") to (1) obtain a one-third interest in Legend for $142,000 and (2) loan the company an additional $283,000 to pay off the balance on its old debts.

_____

**3** <u>See</u> 11 U.S.C. § 1129(b)(2)(B)(ii) (requirement that plan be "fair and equitable" presupposes that "the holder of any claim or interest that is junior to the claims of such class [of unsecured claims] will not receive or retain under the plan on account of such junior claim or interest any property"); <u>In re Bryson Properties, XVIII</u>, 961 F.2d 496, 503 (4th Cir. 1992) ("The absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan."), <u>quoting in part Norwest Bank Worthington v. Ahlers</u>, 485 U.S. 197, 202 (1988) (internal quotation marks, brackets, and citations omitted). Southern and Premier, holding unsecured claims against the estate, each voted against the Legend Plan.

7

On October 7, 1998, the bankruptcy court ordered Legend to file a disclosure statement with respect to the Nicewonder Plan, see 11 U.S.C. § 1125(b), and ordered that any party wishing to submit additional modifications (or a new plan) must do so within sixty days. BBCI appealed the October 7 order and then moved the district court to withdraw its reference of the case to the bankruptcy court. See 28 U.S.C. § 157(d). The district court granted BBCI's motion (and withdrew the reference) on November 19, 1998.

On April 8, 1999, the district court entered an order denying Legend's motion for modification, concluding that the Nicewonder Plan did not "modify" the Edwards Plan because it was actually an entirely new plan. Absent some identity between the two plans, the court reasoned, the Edwards Plan was not subject to alteration under § 1127(b). Legend now appeals the district court's orders (1) affirming the bankruptcy court's confirmation of the Edwards Plan and (2) denying Legend's motion to modify the confirmed Edwards Plan by adding the Nicewonder Plan.

II.

In reviewing the district court's decision to affirm the bankruptcy court's confirmation order, we apply the same level of scrutiny as did the district court. We must accept the facts as found by the bankruptcy court unless we discover those findings to be clearly erroneous. In re Stanley, 66 F.3d 664, 667 (4th Cir. 1995) (citation omitted). The bankruptcy court's application of the law, however, is owed no deference, and is therefore reviewed de novo. Id. Likewise, inasmuch as the district court's denial of Legend's motion for modification rests, in this case, on that court's interpretation of the law, we review that decision de novo.

A.

Legend first challenges the confirmation of the Edwards Plan. For us to reverse on this issue, we would have to conclude that the bankruptcy court clearly erred in finding that BBCI's offer of $335,000 for Legend's assets was fair and reasonable. We do not find clear error.

The evidence before the bankruptcy court as to the value of the radio stations consisted entirely of the conflicting testimony of the two valuation experts -- Otwell, who supported the Edwards Plan, and Dick, who testified for the Sutherlands (and Legend). Otwell's qualifications were extensively documented. He had about thirty years of experience in the radio industry, having personally brokered more than two hundred sales of radio stations. In the course of his business and "on a regular basis," Otwell had appraised radio stations "of all sizes." Dick was similarly well qualified.

Otwell's appraisal of WABN-AM and WABN-FM at $275,000 was based on his comprehensive review of the stations' financial reports, tax returns, schedule of assets, licensing restrictions, effective area of broadcast, and market share as measured by several years of Arbitron ratings. In contrast, Dick's $690,000 valuation de-emphasized many of these same factors, relying instead on the sta-tions' hypothetical performance under optimal management.

In confirming the Edwards Plan, the bankruptcy court accepted Otwell's valuation. That decision was consistent with the realities and the evidence. BBCI's offer of $335,000, which is considerably more in line with Otwell's valuation than with Dick's, was on the table months before either appraisal was commissioned. Moreover, as the bankruptcy court noted, "[n]o upset bids[were] filed against the $335,000 [BBCI] bid incorporated in the Edwards Plan despite the fact that this offer and Plan ha[d] been pending before [the] Court for many months." In other words, the absence of a competing bid over that time is an indication of the fairness of the BBCI bid. Further-more, Nicewonder's proposal (which came much later) to pay $142,000 for a one-third interest in Legend is neither a ringing endorsement of Dick's appraisal nor a condemnation of Otwell's. Even if we assumed that full ownership of the company is worth three times Nicewonder's offer (which, for a variety of reasons, we do not), the extrapolated value of $426,000 is still closer to Otwell's projec-tions than to Dick's and closer still to BBCI's actual bid of $335,000. Under these circumstances, where the bankruptcy court was presented with the valuations of two experts, we cannot say that it committed clear error by adopting the one significantly closer to the only con-crete offer of purchase received over the course of nine months. We

9

therefore affirm the district court's order upholding the bankruptcy court's confirmation of the Edwards Plan.

B.

We turn now to the district court's denial of Legend's motion for modification of the Edwards Plan, a procedure governed by Section 1127 of the Bankruptcy Code. That section provides, in pertinent part:

> The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan . . . . Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified . . . .

11 U.S.C. 1127(b).[4] The parties dispute whether Legend is a "reorganized debtor" with standing to modify a confirmed plan and whether the Edwards Plan has undergone "substantial consummation," thereby precluding it from being materially altered.[5] We need not decide either question, however, because we agree with the district court that the Nicewonder Plan would "modify" the Edwards Plan out of existence, an outcome that we conclude is forbidden by the Bankruptcy Code.

Under the old Bankruptcy Act, which preceded the current Code, the changes proposed by the Nicewonder Plan would not have been accepted as a modification of the Edwards Plan. See Matters of Inland Gas Corp., 275 F.2d 509, 513 (6th Cir. 1960) ("We think the district judge . . . used sound common-sense, practical judgment in declining to permit an altogether new plan to be submitted, under the guise of

_____

[4] Section 1127(a), in contrast, addresses pre-confirmation modifications to proposed plans, which can only be made by the plan's proponent.
[5] See In re Best Products Co., Inc., 177 B.R. 791, 802 (S.D.N.Y.) (noting that after a confirmed plan has been substantially consummated, "[t]he court cannot adopt any modification that materially alters the plan and adversely affects a claimant's treatment") (citations omitted), aff'd, 68 F.3d 26 (2d Cir. 1995).

10

alterations and modifications, in lieu of a sound plan already confirmed by him . . . ."). In reaching its conclusion, the Sixth Circuit quoted Judge Learned Hand:

> [T]he court may never under the guise of "alteration" or "modification" substitute an entirely new"plan" in place of the original[,] although what is the line between a substitute and an "alteration" or a "modification" is necessarily left at large. . . . [I]t is often exceedingly difficult for a bankruptcy court to resist the importunities . . . of those who wish to keep the "revived debtor" indefinitely beneath its aegis . . . . We can do no more than declare, for whatever weight it may have, that we deem the long delay which so often occurs between the order of "confirmation" and the"final order" a major abuse, and that a judge who superintends such a proceeding should feel himself charged with an affirmative duty to insist upon its early conclusion.

Inland Gas, 275 F.2d at 513-14 (quoting Prudence-Bonds Corp. v. City Bank Farmers Trust Co., 186 F.2d 525, 528 (2d Cir. 1951)).

Inland Gas interpreted Section 222 of the old Bankruptcy Act, which, in conjunction with Section 229(c), was the forerunner of the statute at issue here, 11 U.S.C. § 1127(b). **6** As we have previously noted, prior practice under the Act is accorded"significant weight" when construing ambiguities in parallel provisions of the Bankruptcy Code. In re Merry-Go-Round Enters., Inc., 180 F.3d 149, 156 (4th Cir. 1999) (citing Dewsnup v. Timm, 502 U.S. 410 (1992)).

The Nicewonder Plan is clearly a new plan and not merely a modi-

_____

**6** Section 222 provided, in pertinent part, that "[a] plan may be altered or modified, with the approval of the judge, after its submission for acceptance and before or after its confirmation if, in the opinion of the judge, the alteration or modification does not materially and adversely affect the interests of creditors or stockholders." 11 U.S.C. § 622 (repealed 1978). Section 229(c) imposed the additional prerequisite that a plan could not be modified if it had been substantially consummated. 11 U.S.C. § 629(c) (repealed 1978); see Inland Gas, 275 F.2d at 517 (Miller, J., dissenting).

fication of the Edwards Plan. The Edwards Plan divests the Sutherlands of their ownership interest in Legend and provides for the sale of the company's assets to satisfy its creditors. The Nicewonder Plan would permit the Sutherlands to retain control of the radio stations while infusing new money into the existing corporate structure. As the district court concluded:

> The confirmed plan in this case, which was proposed by Edwards, calls for the liquidation of Debtor's key asset -- the radio station. By contrast, the Nicewonder plan is a plan of reorganization which would allow Debtor to continue its ownership and operation of the radio station. The stark contrast between these two plans convinces the court that the Nicewonder plan, rather than modifying a portion or portions of the Edwards plan, has instead wiped the slate clean and developed an entirely new plan, which retains none of the key elements of the confirmed plan.

The two plans are not compatible. Accordingly, we hold that the changes proposed by Legend (through the Nicewonder Plan) to the Edwards Plan are not within the realm of modifications contemplated by § 1127(b). The district court did not err, therefore, in denying Legend's motion for modification. The Edwards Plan is a fair and reasonable plan already confirmed, and we feel "charged with an affirmative duty to insist upon its early conclusion."

The district court's orders on appeal are affirmed.

<u>AFFIRMED</u>

12